UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,              CASE NO. 13-20547

                    Plaintiff,         HON. BERNARD A. FRIEDMAN

v.

D-1   DARRELL FOSTER,

                    Defendant.
_____/

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

The United States of America, by and through its undersigned counsel, respectfully submits this opposition to Defendant's Motion for Compassionate Release (ECF No. 49, PgID.216). Foster's motion should be denied because he presents no compelling reasons for his release. Foster is at a prison with a minimal number of Covid-19 positive inmates, Foster's medical conditions are well controlled, and Foster has only served about a third his 188-month sentence. The Court imposed this sentence to keep Foster "off the streets as long as we possibly can" because Foster was "dangerous" and his crimes "jeopardized society substantially." The Court also stated that Foster's sentence "has to be severe"

because his crimes – committing home invasions and stealing firearms, among other items – created "trauma" and "victims for life." Foster should not be released from prison early in light of his dangerousness and the serious nature of his crimes, especially considering that "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Foster's motion should be denied.

## Background

I. **Foster committed several home invasions, one of which involved stealing two pistols that he sold on the streets of Detroit in exchange for drugs.**

During the summer of 2012, a rash of home invasions were committed in a four-block radius in the City of Grosse Pointe Farms, Michigan. Based on interviews with the victim homeowners, detectives learned that the perpetrator's modus operandi was to pose as a window washer. The robber would go door-to-door with a bucket and newspapers offering to wash the exterior of windows. He would use the opportunity to case the home and, when the homeowners were not present, break-and steal valuables. One of these home invasions occurred at a residence on Chalfonte. Foster became a suspect when it was discovered that he left a bucket at the scene of the crime that contained two squirt bottles, newspapers often used for cleaning windows, and medical related papers in his name. The

home invasions abruptly stopped when Foster was arrested by Detroit Police on September 12, 2012, for committing a home invasion in Detroit, Michigan.

On September 26, 2012, detectives interviewed Foster while he was in custody at the Wayne County Jail for the home invasion in Detroit. Foster admitted that he used his own squirt bottles and newspapers for washing windows, that he carried those items in a bucket, and that he had not seen that bucket for a while. Foster also stated that he left the bucket at his former address in Detroit when he moved. When the detectives mentioned that the bucket was found at the Chalfonte residence, Foster became uncooperative and did not wish to talk anymore. Foster pleaded guilty in state court to the home invasion in Detroit and was sentenced on October 17, 2012, to 10 months in jail and three years' probation.

Shortly after Foster's release from jail, the home invasions in Grosse Pointe Farms began again. On May 13, 2013, a gold chain and two handguns were stolen from a residence on Bournemouth in Grosse Pointe Farms. Foster became a suspect when the homeowner informed detectives that a man named "Darrell" who matched the defendant's description had come to the door asking to wash their windows about two weeks prior. In addition, detectives lifted a latent fingerprint off the jewelry box where the stolen gold chain was kept. Lab results later returned with a positive match to Foster.

After the home invasion on Bournemouth, another home invasion occurred on Barclay, approximately three blocks from Bournemouth. The homeowners on Barclay told detectives that on the day of the home invasion they saw Darrell Foster next door seeking work. Detectives also checked with local pawn dealers and obtained records indicating that Foster pawned a gold chain on the same day as the home invasion on Bournemouth. Other pawn records showed that Foster pawned bicycles stolen from other residences, including a bicycle that was taken from the home on Barclay.

Foster, who was on parole at the time, was arrested and subsequently interviewed by a detective. Foster admitted to committing multiple home invasions in Grosse Pointe Farms, including the home invasion on Bournemouth, in which he stole a gold chain and two handguns. Foster stated that he took the handguns to a drug house in Detroit and exchanged the two firearms for 10 rocks of crack cocaine and $100 in cash.

On July 23, 2013, Foster was indicted by a federal grand jury on one count of being a felon in possession of firearms, in violation of Title 18, United States Code, Section 922(g). On August 19, 2014, Foster pleaded guilty as charged pursuant to a Rule 11 plea agreement. Foster was subject to a 180-month mandatory minimum sentence under the Armed Career Criminal Act, and his

Sentencing Guideline range was 188 to 235 months' imprisonment. (PSR, ¶ 60, p.

15).

## II.  Foster is a life-long offender who failed to rehabilitate himself despite numerous treatment opportunities and prior periods of incarceration.

The Presentence Report that was prepared for Foster's sentencing hearing

showed that Foster was a chronic criminal offender who had not responded to

periods of incarceration, substance abuse treatment or mental health treatment.

According to the PSR, Foster had 15 prior adult convictions, including: two

separate convictions for possession of controlled substances (1987), prison escape

(1989), larceny (1991), retail fraud (1997), larceny (1998), larceny in a building

(1999), retail fraud (2000), possession of a financial transaction device (2002),

prisoner possessing contraband (2002), possession of a controlled substance

(2002), delivery of a controlled substance (2003), breaking and entering habitual

4th (2012), and two separate convictions for home invasion (2nd degree) (2013).

(PSR, ¶ 23-37, p. 5-11).

Foster, who was 47 years' old at the time of his sentencing, received his first

criminal conviction at age 19. (PSR, ¶ 23, p. 5).  He continued committing crimes

on a regular basis ever since. In fact, Foster was convicted, incarcerated, or on

court supervision in some capacity nearly every year of his adult life.  Foster

received many lenient sentences from the State's criminal justice system (in three

cases he received probation, and in five cases he received just 60 days in jail or

less). Foster's longest sentence was in June of 2003, when he received a minimum of one year and 11 months and a maximum of up to 10 years custody for delivery of controlled substances. (*Id.* at ¶ 34, p. 9). However, Foster was released on parole after serving approximately four years of his sentence. (*Id.*). Foster responded by absconding from parole eight times from 2008 to 2010 (the State reinstated parole each time) and committing the home invasions in Detroit and Grosse Pointe Farms in 2012 and 2013. (*Id.*).

The PSR also showed that Foster had repeatedly received substance abuse treatment at the Sobriety House (2008, 2011, and 2012), Mariners Inn (2013), and the Shar House (2013), yet continued to use crack cocaine up to the time that he committed the break-ins. (PSR, ¶ 51, p. 14). Foster was also receiving mental health treatment from Team Mental Health in Detroit at the time he committed the home invasions. (*Id.* at ¶ 50, p. 13).

Lastly, the PSR described many of the personal characteristics that Foster highlights in his compassionate release motion: his emotional and mental health problems, his substance abuse problems and his medical problems. With respect to his medical problems, the PSR noted that Foster was obese at the time of his sentencing (Foster was 5'7" tall and weighed 266 pounds, which equates to a Body Mass Index of 41.7). (PSR at ¶ 48, p. 13). Foster also had been diagnosed with an immunodiciency condition, but his immune system was fully functional. The level

of the condition in his blood was "below the limits of detection," and his CD4

count of 720 cells per cubic millimeter of blood was equal to that of a normal,

healthy person. (PSR at ¶ 49, p. 13); National Institutes of Health, U.S. National

Library of Medicine, MedlinePlus (stating that a CD4 white cell count of 500-

1,200 cells per cubic millimeter of blood is "normal").

### III.    The victims asked the Court to impose "serious jail time."

The victims, a retired husband and wife whose home Foster burglarized,

attended the sentencing hearing and one of them spoke directly to the Court about

how Foster's crime impacted them. The husband told the Court that Foster "had no

right to do what he did . . . to invade our home." (ECF No. 51, Page 10). The

husband explained that, in addition to the firearms, Foster stole a necklace that he

gave his wife for Christmas and that "our wedding rings are missing, and a watch

that was my mother's." (*Id.*). Aside from the loss of sentimental items, the husband

explained the emotional trauma caused by Foster's crime. The couple had "always

felt safe," but "[n]ow that feeling is gone." (*Id.*). The couple "constantly check all

the locks in the house, the windows to make sure our house is safe." Foster's home

invasion caused them to "distrust people coming into the house. We used to give

people the benefit of the doubt, no more." (*Id.*). The couple's "trust [wa]s gone"

because they "allowed him to wash our windows and we paid him," but "he was

only casing our house and came back later and he broke in." (*Id.* at Page 11). The

burglary was particularly impactful on his wife, who "had difficulty sleeping," and was prone to "crying and screaming about this." (*Id.*). The husband expressed his view that Foster needed "some serious jail time" because "[h]e obviously didn't learn anything from his earlier jail time and his opportunities to kick the drug habit. He's broken the law, hurt people, and gotten caught many times. We don't know or care how remorseful he may be. He's not a child who doesn't understand right from wrong. Mr. Foster is [an] adult . . . We think he deserves to return to jail and do his time." (*Id.*).

## IV.   The Court imposed a "severe" sentence because Foster's crime was "dangerous" and "very, very serious."

The Court sentenced Foster to 188 months' imprisonment. The Court described Foster as having "a long, long history of violations of the criminal law." (ECF No. 51, Page 22). The Court acknowledged Foster's drug addiction, emotional problems and physical ailments, but concluded that "none of those balance or weigh out what he's done." (*Id.*). The Court described Foster's crime as "very, very serious" because "there's no question about it that home invasion is a dangerous operation in and of itself." (*Id.* at Page 22-24). The Court noted that by committing a home invasion and stealing guns, Foster put people in a position where they may have "gotten hurt, including maybe a police officer, maybe a neighbor, or maybe even the defendant." (*Id.* at Page 24).

8

The Court addressed the victims of Foster's crime and stated the Court "appreciate[d] the victims being here," because it was a "good thing" that the Court hear about how Foster's crime affected them. (ECF No. 51, Page 24). The Court acknowledged "the trauma that is caused by somebody coming into your home," which the Court described as "a sacred place . . . a place that you feel that you are protected . . . And once your house has been invaded such as happened here . . . it's never the same, and it never will be the same . . . It's a crime that's not only dangerous, but it creates victims for life . . . . (*Id.* at Page 24-25). The Court stated that it wanted the victims "to know that I understand that, and that society understands that, and that's why the penalty has to be severe." (*Id.* at Page 25).

The Court further stated that punishment was "a very, very important" part of the Court's sentence because Foster's long history of criminal conduct "has reached the point where he has to be punished." (ECF No. 51, Page 25). The Court stated that while deterrence was important, the Court believed that Foster has not been deterred by prior periods of incarceration and therefore, "I don't think there's much we're going to do to deter him except keep him off the streets as long as we possibly can." (*Id.* at 26). The Court believed that a lengthy sentence was also necessary because by selling the guns on the street, Foster "has jeopardized society substantially." (*Id.*). The Court stated that "[s]omebody's going to get hurt" with

the guns Foster sold because "[p]eople don't' buy guns on the street illegally  not to use them." (*Id.*).

## VII.   Foster has served only about one-third of his sentence, is located at a prison where only three inmates have Covid-19, and all of his medical conditions are well controlled.

Foster has completed approximately 38 percent of his 188-month sentence, and his expected release date is May 14, 2028. Foster is serving his sentence at FCI Hazelton located in Bruceton Mills, West Virginia, which is a medium security facility with a population of 1,217 inmates. According to the Bureau of Prisons' website as of December 7, 2020, only three inmates in FCI Hazelton are currently positive for Covid-19, as are five staff members. BOP Covid-19 Website. During the course of the pandemic, three other inmates and 12 staff member at FCI Hazelton tested positive for Covid-19 and all have recovered. There have been no Covid-19 related deaths of inmates or staff at FCI Hazelton. As of December 7, 2020, the Bureau of Prisons has completed Covid-19 tests for 443 inmates at FCI Hazelton and five tests are currently pending.

Medical records from the Bureau of Prisons (which are attached as Exhibit A, and filed under seal) for 2020 and 2019 show that Foster's medical conditions are about the same as they were when the Court sentenced him. Foster is now 53 years' old and according to measurements taken on September 18, 2020, he weighs 278 pounds, which equates to a Body Mass Index of 43.5.

Foster's BOP medical records from 2019 indicate that he has been diagnosed with type 2 diabetes, but that Foster had a "low adherence" rate of taking his medication. In March, 2020, Foster refused to take his diabetes medication (metformin) because he claimed it caused some unwanted side effects. The BOP prescribed Foster new diabetes medication. There is nothing in Foster's medical records indicating that his diabetes is uncontrolled or particularly severe.

Foster's BOP medical records indicate that Foster's immunodiciency condition is "well controlled" with medication and the BOP medical staff "has appropriate monitoring parameters in place" to detect any change in the disease's progression. According to measurements in November, 2020, the condition was "not detected" in his blood and his CD4 white blood cell count was 983, which is equivalent to that of a normal, healthy person. Foster is examined at least quarterly and his measurements have remained consistent.

As for mental health, Foster was diagnosed in July, 2020, with "depressive disorder" and was described as "melancholy." Foster was prescribed a certain type of medication that has provided him "good benefit" in the past.

Foster now seeks compassionate release from prison because of the Covid-19 pandemic and his health conditions. (ECF No. 49, PgID.216). On May 25, 2020, Foster submitted a request to the warden of FCI Hazelton for a reduction in

his sentence. The warden denied the request on June 2, 2020. Foster has therefore

met the administrative exhaustion requirement in 18 U.S.C. § 3582(c)(1)(A).

## Argument

**I.      The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

### A.      The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread

within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For

over almost a decade, the Bureau of Prisons has maintained a detailed protocol for

responding to a pandemic. Consistent with that protocol, the Bureau of Prisons

began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

On March 13, 2020, the Bureau of Prisons started modifying its operations to

implement its Covid-19 Action Plan and minimize the risk of Covid-19

transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified

Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of

Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread

of the disease, the Bureau of Prisons has restricted inmate movement within and

between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed

in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided

with medical evaluation and treatment and are isolated from other inmates until

testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. When visitation is permitted at an institution, the visits are non-contact, require masks, and social distancing between inmates and visitors is enforced, either via the use of plexiglass (or similar barriers), or physical distancing (i.e., six feet apart). Visitors are screened for Covid-19 symptoms and their temperature is checked. Visitors who are sick or symptomatic are not allowed to visit, and inmates in quarantine or isolation cannot participate in social visiting. *See* BOP Modified Operations. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month, and legal visits are accommodated upon request. *See* BOP Modified Operations.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected

13

from Covid-19 and ensure that they receive any required medical care during these difficult times.

### B.    The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Currently, the Bureau of Prisons has 8,081 inmates on home confinement, and the total number of inmates placed in home confinement from March 26, 2020 to the

present (including inmates who have completed service of their sentence) is

18,412. BOP Coronavirus FAQs. As the Sixth Circuit stressed, these efforts show

that "[t]he system is working as it should": "A policy problem appeared, and

policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir.

2020).

This policy solution is also tailored to the realities of the Covid-19

pandemic. As the Attorney General's directives have explained, the Bureau of

Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria

account for justifiable concerns about whether inmates "might have no safe place

to go upon release and [might] return to their criminal activities," as well as

"legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates

indiscriminately and unleash tens of thousands of convicted criminals, en masse.

*See id.* It must focus on the inmates who have the highest risk factors for Covid-19

and are least likely to engage in new criminal activity. This is true not just to

protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting

16

Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, 452 F.Supp.3d 705, 712 (E.D. Mich. 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.   The Court should deny Foster's motion for compassionate release.

Foster's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority

to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). And as the Sixth Circuit has held, this statutory exhaustion requirement is mandatory. *Alam*, 960 F.3d at 832–36. Here, Foster has met this requirement when the warden of FCI Hazelton denied his compassionate release request on June 2, 2020.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for release. 18 U.S.C. § 3582(c)(1)(A). The defendant's "generalized fears of contracting Covid-19, without more," do not satisfy this requirement. *United States v. Jackson*, 2020 U.S. App. LEXIS 32269, at *6 (6th

18

Cir. Oct. 13, 2020); *accord United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *2 (6th Cir. May 21, 2020).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020). As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

## A. Foster has not shown "extraordinary and compelling reasons" for compassionate release.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), contains two overlapping requirements for scrutinizing an inmate's initial eligibility for release. First, an inmate must demonstrate that "extraordinary and compelling reasons" warrant a reduction in his sentence. *Id.* Second, release must be "consistent with applicable policy statements issued by the Sentencing Commission." *Id.* That applicable policy statement *should* be USSG § 1B1.13, which contains various criteria related to a defendant's medical conditions, age-related issues, family circumstances, or other reasons, USSG § 1B1.13 cmt. n.1, and which requires that the defendant "not [be] a danger to the safety of any other person or to the

19

community," USSG § 1B1.13(2). That policy statement should be binding here, as the analogous policy statement in USSG § 1B1.10 is for sentence reductions under 18 U.S.C. § 3582(c)(2). *See Dillon v. United States*, 560 U.S. 817, 819 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). Recently, however, a Sixth Circuit panel concluded in *United States v. Jones*, ___ F.3d ___, No. 20-3701, 2020 WL 6817488, *6 (6th Cir. Nov. 20, 2020), that § 1B1.13 is not "applicable"—and thus does not apply at all—to defendant-initiated motions for compassionate release.

*Jones*'s analysis on that point was incorrect, and the government preserves for further review its argument that USSG § 1B1.13 is binding here. Further, as Judge Cook's concurrence made clear, the *Jones* panel's discussion of § 1B1.13 was dicta. *Jones*, 2020 WL 6817488, at *13 (Cook, J., concurring). The only holding in *Jones* was that the district court there did not abuse its discretion in denying release based on the § 3553(a) factors. *Id.* So the remainder of the panel's opinion is not binding. *See Wright v. Spaulding*, 939 F.3d 695, 700–02 (6th Cir. 2019) (explaining that "only holdings" and "not dicta" are binding in subsequent cases).

But even if the Court were to follow the dicta in *Jones*, Foster has not satisfied the statutory requirement of showing that "extraordinary and compelling reasons" warrant a sentence reduction. Even if not mandatory, § 1B1.13 continues

20

to "provide a working definition of 'extraordinary and compelling reasons,'" which can "guide" a district court's decision "without being conclusive." *United States v. Gunn*, ___ F.3d ___, No. 20-1959, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020). And even without § 1B1.13, the plain language of the compassionate-release statute does not permit "a sort of Wild West" or allow "every district judge [to] hav[e] an idiosyncratic release policy." *Id.* The analyses of the Sentencing Commission, as represented in § 1B1.13 and its Application Notes, and the BOP Director should still be "given substantial weight," and "strik[ing] out on a different path risks an appellate holding that judicial discretion has been abused." *Id.*; *see also Jones*, 2020 WL 6817488, at *9 (quoting with approval a prior panel's observations that "'discretion' does not mean 'whim'" and "[a] court might abuse its discretion, for example, if it misreads the meaning of the extraordinary-reason requirement").

That statutory language, rather, requires that a defendant satisfy two strict criteria to be initially eligible for compassionate release. 18 U.S.C. § 3582(c)(1)(A)(i). *First*, the defendant's reasons must be "extraordinary"— meaning exceptional or uncommon. *United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020); *United States v. Sapp*, No. 14-CR-20520, 2020 WL 515935, at *3 (E.D. Mich. Jan. 31, 2020). *Second*, the defendant's reasons must be "compelling"—meaning "so great that irreparable

harm or injustice would result if the relief is not granted." *Sapp*, 2020 WL 515935, at *3. A defendant must establish both criteria to satisfy the statute's eligibility threshold. Foster has not done so.

As an initial matter, the government agrees that Foster's circumstances qualify as "extraordinary." Foster's medical records establish that he is obese and has type 2 diabetes, which the CDC has confirmed are risk factors that place a person at increased risk of severe illness from Covid-19. *See* CDC Risk Factors (as updated). According to the CDC, Foster's immunodiciency condition is not a risk factor for Covid-19; only people with "a low CD4 count" or who are "not on . . . treatment" are considered at risk for Covid-19. *Id.* Nevertheless, given the heightened risk that Covid-19 poses to someone with obesity and type 2 diabetes, Foster has shown "extraordinary" reasons for release under § 3582(c)(1)(A).

But Foster's reasons for release are not "compelling." In the pretrial-release context, the Sixth Circuit has already addressed what qualifies as a "compelling" reason for release based on Covid-19. *United States v. McGowan*, No. 20-1617, 2020 WL 3867515, at *2 (6th Cir. July 8, 2020); *Bothra*, 2020 WL 2611545, at *2. That analysis considers (1) the "original grounds" for the defendant's incarceration; (2) the "specificity" of his "stated Covid-19 concerns"; (3) the extent to which the proposed release plan would "mitigate or exacerbate" his risk from Covid-19; and (4) the risk from Covid-19 that his release would pose to others.

*McGowan*, 2020 WL 3867515, at \*2. In *Bothra*, for instance, the defendant was in his 70s and "had health issues rendering him more vulnerable to contracting [Covid-19]." 2020 WL 2611545, at \*2. But he was a flight risk, had orchestrated a large and complex fraud scheme, and was detained at a facility that had very few cases of Covid-19. *Id.* The Sixth Circuit thus held that his circumstances did not present a "compelling" reason for release. *Id.*

Foster's circumstances are even less compelling. The "original grounds" for Foster's incarceration here were his chronic and lengthy criminal record, his refusal to rehabilitate himself in the past, the dangerous nature of his crime, and the trauma that it caused the victims. *McGowan*, 2020 WL 3867515, at \*2. When the Court balanced these factors at sentencing, it found that Foster's sentence "had to be severe" and that the Court had to "keep him off the streets as long as we possibly can." (ECF No. 51, Page 25-26). The Court also found that Foster's home invasions were "dangerous," and that his decision to sell guns onto the street "jeopardized society substantially." (*Id.*). Foster's dangerousness, as contemplated under USSG § 1B1.13(2), should continue to "guide" the Court's analysis here. *Gunn*, 2020 WL 6813995, at \*2. And unlike the pretrial defendant in *Bothra*, Foster was *convicted* of his offense here—not just accused of it. So the justice system's "essential" interest in finality weighs far stronger against Foster's release

23

than it did the defendant's release in *Bothra*. *Teague v. Lane*, 489 U.S. 288, 309 (1989).

Foster has also not demonstrated that his release would mitigate his risk of contracting Covid-19. In his compassionate release request to the warden of FCI Hazeleton, Foster indicated that, if released, he would live with his mother at a her residence in Detroit, Michigan. This living arrangement would do little to mitigate Foster's risk of contracting Covid-19. For starters, only three inmates at FCI Hazelton are positive for Covid-19, whereas the number of Covid-19 positive people in Detroit is 22,053. City of Detroit Covid-19 Dashboard; *see also United States v. Harvey*, No. 17-CR-20272-01, 2020 WL 6110859, at *2 (E.D. Mich. Oct. 16, 2020) (Friedman, J.) (denying compassionate release, in part, because "defendant has not shown that the risk of infection at FCI-Morgantown is unacceptably high" because "no staff members and just three inmates" were infected with Covid-19). Moreover, Foster's mother has been unable to control or prevent Foster's criminal behavior his entire life, and there's nothing in the record to indicate that this dynamic would change. Foster claims that his "increasing age . . . reduces the likelihood of recidivism," (ECF No. 49, PgID.237), but this Court was skeptical of this argument at Foster's sentencing, and should remain skeptical today. The Court stated that it was "well aware" of the fact that Foster will be "up in age" at the time of his release from prison, but the Court still believed it

necessary to impose "zero tolerance" of any supervised release violations because "even though I agree that the older you get, the less likely it is to commit crimes. I'm not sure that's true in this particular case because of his long history." (ECF No. 51, Page 28).

On top of all that, Foster's long history of parole and probation violations makes it unlikely that he will comply with release conditions and social-distancing protocols that could diminish his risk of contracting Covid-19 if released from custody. Although the *average* person might have a higher risk of contracting or developing complications from Covid-19 in prison than if released, an *individual* defendant's risk varies widely. A defendant's risk of contracting Covid-19 also depends not just on his opportunities for social-distancing, but on his willingness to take advantage of those opportunities and engage in social-distancing for the pandemic's duration.

In short, Foster has failed to present the Court with reasons for his release that are so "compelling" that "irreparable harm or injustice would result if the relief is not granted." *Sapp*, 2020 WL 515935, at *3.

**B.    The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.**

Even when an inmate has shown "extraordinary and compelling reasons," he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is

appropriate. 18 U.S.C. § 3582(c)(1)(A). A defendant's failure to establish that the
§ 3553(a) factors support relief is an independent basis for denying compassionate
release. *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020); *accord
United States v. Austin*, 825 F. App'x 324, 325–27 (6th Cir. 2020) (upholding a
district court's denial of compassionate release based on the § 3553(a) factors);
*United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (same). So
even if the Court were to find that Foster established extraordinary and compelling
reasons for his release, the § 3553(a) factors should still disqualify him.

 For starters, Foster has only served a little over one-third of his 188-month
sentence, and the significant portion of his remaining sentence weighs heavily
against release. *Harvey*, 2020 WL 6110859, at *2 (denying compassionate release,
in part, because defendant had served "only approximately twenty percent" of his
120-month sentence and releasing defendant after "such a short period of time"
would "seriously undermine" the § 3553 sentencing objectives); *United States v.
Yatzek*, No. 17-CR-20303-01, 2020 WL 5868379, at *2 (E.D. Mich. Oct. 2, 2020)
(Friedman, J.) ("The Court also finds that release in this case would be all the more
inappropriate in light of the fact that defendant has served only approximately
three-fifths of his sentence for a serious crime."); *United States v. Littleton*, No. 18-
CR-20041-01, 2020 WL 5525215, at *2 (E.D. Mich. Sept. 15, 2020) (Friedman, J.)
(denying compassionate release for a defendant who completed 30% of his 78-

26

month sentence, in part, because "defendant has served only a fraction of his
sentence for serious crimes.").

In addition, as this Court pointed out at sentencing, Foster's spree of home
invasions was "dangerous" because "a police officer, maybe a neighbor, or maybe
even the defendant," could have been hurt had someone come to investigate the
break-ins and confronted Foster. (ECF No. 51, Page 24). This Court's reasoning is
consistent with Sixth Circuit case law, which holds that home invasions are
dangerous because they "involve a serious potential risk of physical injury arising
from the possibility of a face-to-face confrontation between the offender and a
third party -- whether an occupant, a police officer, or a bystander -- who comes to
investigate." *United States v. Cole*, 528 F. App'x 479, 481 (6th Cir. 2013). This
Court also found Foster's conduct dangerous because he sold the stolen guns on
the street for drugs. This Court said that introducing guns into the illicit  market
"jeopardized society substantially" because "[p]eople don't buy guns on the street
illegally  not to use them." (ECF No. 51, Page 26). In short, Foster's dangerousness
to society is a strong reason to keep him incarcerated. *Harvey*, 2020 WL 6110859,
at *2 (denying compassionate release, in part, because drugs and guns "are a lethal
combination" and the "danger defendant poses to the community is obvious").

Releasing Foster early would also not serve the need for punishment
contained in § 3553(a). As this Court found at sentencing, Foster's chronic

criminal record means that "he hasn't been deterred, and I don't think there's much we're going to do to deter him except keep him off the streets as long as we possibly can." (ECF No. 51, Page 26). The Court explained that Foster "had to be punished" for his crimes and that punishment was "a very, very important part" of Foster's sentence. (*Id.* at Page 25).

Lastly, releasing only offenders who do not pose a danger to the public or present a significant risk of recidivism is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. Drug overdoses are skyrocketing. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

**Conclusion**

Foster's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/Michael C. Martin
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9100
E-Mail: Michael.C.Martin@usdoj.gov

Date: December 8, 2020

## **CERTIFICATE OF SERVICE**

I hereby certify that on <u>December 8, 2020</u>, I filed the foregoing document on the ECF system, which will send notice to David Tholen, attorney for the defendant.

<div style="margin-left: 40%">

<u>s/Michael C. Martin</u>
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9100
E-Mail:  Michael.C.Martin@usdoj.gov

</div>